UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 1:22-cr-00082-TWP-MJD |
| | ) |
| KEITH J. JONES | ) |
|    a/k/a KEYBO, | )   -01 |
| KEVIN M. BACKSTROM, | )   -02 |
| HERMAN WESLEY TAVORN | ) |
|    a/k/a WES, | )   -22 |
| | ) |
| Defendants. | ) |

**ORDER ON MOTION TO SUPPRESS VIDEO SURVEILLANCE EVIDENCE**

This matter is before the Court on Defendant Keith Jones' ("Jones") Motion to Suppress Video Surveillance Evidence ("Motion to Suppress") ([Filing No. 749](#)), in which Defendants Kevin Backstrom ("Backstrom") and Herman Tavorn ("Tavorn") join. **Jones** is charged in Count One: Conspiracy to Distribute Controlled Substances; Count Two: Engaging in a Continuing Criminal Enterprise; Count Three: Conspiracy to Launder Money Instruments; Counts Four and Nineteen: Distribution of Methamphetamine; Counts Nine, Ten, Fourteen, and Fifteen: Possession of Methamphetamine with Intent to Distribute; Counts Twelve and Sixteen: Distribution of Fentanyl; Count Twenty-One: Possession of Fentanyl with Intent to Distribute; and Counts Twenty-Two and Twenty-Three: Possession of a Firearm by a Convicted Felon. **Backstrom** is charged in Count One: Conspiracy to Distribute Controlled Substances; and Count Three: Conspiracy to Launder Money Instruments. **Tavorn** is charged in Count One: Conspiracy to Distribute Controlled Substances; and Count Thirteen: Possession of Fentanyl with Intent to Distribute.

Jones seeks to suppress evidence obtained through audio and video surveillance of his residence, arguing that the surveillance violated his Fourth Amendment rights. For the following reasons, the Motion to Suppress is **denied**.

## I.     BACKGROUND

A hearing is not necessary on a motion to suppress unless "there are disputed issues of material fact which will affect the outcome of the motion.'" *United States v. Juarez*, 454 F.3d 717, 719–20 (7th Cir. 2006). The facts in this case are not disputed by the parties, and neither Jones, Backstrom, Tavorn nor the Government has requested a hearing, so no hearing is necessary.

On May 24, 2022, the Government submitted two applications to the Court: one seeking permission to intercept wire and electronic communications for two of Jones' cell phones and oral communications at Jones' residence; and one seeking permission to intercept closed-caption television ("CCTV") communications at Jones' residence (Filing No. 777 at 2). Both applications were supported by identical affidavits (the "May Affidavit"). The same day, a district court judge issued orders granting both applications. *Id.* On June 24, 2022, the Government submitted two more applications, again seeking permission to intercept wire and electronic communications, oral communications, CCTV communications at Jones' residence. *Id.* at 2–3. These applications were likewise supported by identical affidavits and were also granted (the May 24 and June 24, 2022 Orders, collectively, the "CCTV Orders").

On July 7, 2022, a federal grand jury returned an Indictment against Jones and several other co-defendants[1] (Filing No. 1). The following day, a Notification of Assigned Judge, Automatic Not Guilty Plea, Trial Date, Discovery Order and Other Matters document was filed, ordering that all motions, including motions to suppress, be filed within thirty days of the appearance of counsel

---

[1] Because this Order is not under seal, the Court will not use specific names of the co-defendants.

(Filing No. 9). Jones' original counsel filed his appearance on July 26, 2022 (Filing No. 137). On September 26, 2022, the Court issued an Order Setting Final Pretrial, Trial, and Pretrial Filing Deadlines, ordering that pretrial motions pursuant to Federal Rule of Criminal Procedure 12(b)(3)—which includes motions to suppress—be filed two weeks before the final pretrial (Filing No. 287 at 2). At the time of the filing of the Motion to Suppress, the final pretrial conference was set for October 4, 2023 (Filing No. 287). Jones filed his Motion to Suppress on September 20, 2023 (Filing No. 749).

## II. DISCUSSION

Jones' Motion to Suppress, in which Backstrom and Tavorn join, challenges the CCTV Orders to the extent they authorized audio and video surveillance ("CCTV surveillance") inside Jones residence.[2] The Motion to Suppress does not challenge the portions of the CCTV Orders authorizing the interception of wire and electronic communications from Jones' cell phones.

Applications for CCTV surveillance are not governed by the federal wiretap statute, 18 U.S.C. § 2518, but in *United States v. Torres*, 751 F.2d 875, 877 (7th Cir. 1984), the Seventh Circuit held that Court may issue warrants for CCTV surveillance pursuant to Federal Rule of Criminal Procedure 41. The *Torres* Court further held that even though "secretly televising people . . . while they are in what they think is a private place is an even grater intrusion on privacy than secretly recording their conversations," CCTV surveillance is not *per se* unconstitutional. *Id.* Nevertheless, recognizing the great intrusion inherent in televised surveillance, the Seventh Circuit

---

[2] As the Government clarifies in its response, CCTV surveillance captures only visual, non-verbal communications, although the Government was also authorized by the CCTV Orders to intercept oral communications. For ease of reference, the Court refers to the visual and audio surveillance challenged by Jones, Backstrom, and Tavorn, collectively as "CCTV surveillance."

held that warrants for televised surveillance must satisfy the requirements of the federal wiretap statute. *Id.* at 884.

The federal wiretap statute, in turn, requires that the issuing judge certify that: (1) normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; (2) that the warrant contains a particularized description of the type of communications sought to be intercepted, and a statement of the offense to which it relates: (3) that the period of interception is not longer than necessary to achieve the objective of the authorization, but in no event longer than thirty days; and (4) that the interception is conducted in such a way as to minimize the interception of communications not otherwise subject to interception. Jones challenges the second requirement (the "necessity" requirement) and the fourth requirement (the "minimization" requirement). Jones argues that the Government failed to show that CCTV surveillance was necessary in lieu of other traditional investigative techniques and did not take adequate steps to ensure its CCTV surveillance was minimized to avoid intercepting non-pertinent communications ([Filing No. 749 at 8](#)). The Court will address each argument in turn.

A.  **Necessity Requirement**

Jones first argues that CCTV surveillance was unnecessary because: the Government could have (and should have) used less intrusive investigative methods instead of CCTV surveillance; the Government had already obtained the information it sought through less intrusive methods; and the Government did not need the information it sought to ascertain through CCTV surveillance ([Filing No. 749 at 6](#), 8).

To adequately show "necessity" under 28 U.S.C. § 2518(1)(c), the Government only needs to supply a "full and complete statement as to 1) whether or not other investigative procedures have been tried and failed; 2) why those procedures reasonably appear to be unlikely to succeed, if tried; or 3) why other investigative procedures would be too dangerous." 18 U.S.C. § 2518(1)(c).

4

The Government must establish only one of the three criteria, and its burden of demonstrating necessity for wiretaps is "not great." *Ceballos*, 302 F.3d at 683. As to both the May and June Affidavits, the Government has met its burden.

### 1. May Affidavit

In its May Affidavit, the Government demonstrated that less intrusive investigative methods either were unsuccessful, were unlikely to succeed, or were too dangerous. With respect to the use of informants, the May Affidavit stated that the DEA was unaware of any informants who could provide information about Jones' drug trafficking activity (Filing No. 777-1 at 85). The May Affidavit further noted that the use of potential cooperating witnesses was not likely to succeed based on earlier interactions with other suspects. *Id.* at 63–64. For example, after a package of methamphetamine was seized from a co-defendant's vehicle, she failed to cooperate with law enforcement by declining to identify the person who provided the package and by denying knowledge of its contents. *Id.* at 86. A co-defendant also provided a false statement to law enforcement as to how he acquired $344,275.00, which law enforcement seized during an in interdiction stop in April 2022. *Id.*

The May Affidavit also noted that the DEA used an undercover officer, posing as a UPS driver, to deliver a package containing sham controlled substances to a co-defendant in January 2022, but the undercover officer was unable to acquire information about Jones or his drug trafficking operation during that interaction. *Id.* at 86–87. Further use of undercover officers appeared unlikely to succeed due to the insular nature and hierarchical structure of drug trafficking organizations. *Id.* at 87–88 (stating undercover officer would "[a]t best" succeed in speaking with "fringe" operatives of drug trafficking organization, with whom higher-up members of the organization would try to avoid communications).

As to grand jury subpoenas, the May Affidavit stated that the targets of the investigation would likely not cooperate and/or invoke their constitutional right to remain silent, and issuing subpoenas would also alert members of the alleged conspiracy to the investigation and compromise it. *Id.* at 88–89.

Additionally, other types of searches failed in achieving the goals of the investigation. *Id.* 89–91. Specifically, the searches of trash from Jones' residence were sometimes unsuccessful because Jones lived in an apartment complex, and his trash would become comingled with other residents' trash. *Id.* at 89. Neither the trash from Jones' residence nor the trash seized from other locations identified Jones' suppliers or customers, the location where Jones stored his drug proceeds, or the way Jones paid his methamphetamine suppliers. *Id.* at 90. The search of intercepted parcels likewise did not identify the supplier of the parcels' contents, the person who shipped the parcels, the intended recipient, the location where Jones stored his drug proceeds, or the way Jones paid his methamphetamine suppliers. *Id.* at 90–91. Similarly, the interdiction stop and search of a tractor trailer driven by a co-defendant in April 2022 resulted in the seizure of $344,250.00 in drug proceeds and information about an unidentified male who supplied Jones with cocaine, but the stop did not generate evidence as to Jones' methamphetamine suppliers, his customers, the location where he stored his drug proceeds, or the way Jones paid his methamphetamine suppliers. *Id.* at 92–93.

The May Affidavit then explained that the execution of search warrants was not likely to achieve the goals of the investigation, because the affiant did not believe that Jones kept controlled substances at his residence for sustained periods of time, and a search of Jones' alleged "stash location" would not identify Jones' suppliers or customers or yield any evidence of Jones' alleged money laundering operation. *Id.* at 91–92. The affiant also noted that the DEA would likely not

find all the suspected members of Jones' drug trafficking operation in one location, and the execution of one search warrant would alert the subjects to the investigation. *Id.* at 92.

The May Affidavit next addressed the use of GPS tracking devices, precision location information, pole cameras, mail covers, and a financial investigation. *Id.* at 93–96, 99–103. While GPS tracking and precision location information allowed the DEA to track Jones' travels throughout Indianapolis, it did not yield information about the purpose of those travels or the purpose of Jones' meetings with other individuals. *Id.* at 94. Pole camera surveillance outside Jones' residence captured Jones' meetings with various people outside his residence, and combined with intercepted cell phone conversations, confirmed that Jones delivered controlled substances during some of those meetings. However, the pole camera surveillance did not yield any information about the type or amount of controlled substances delivered, which could only have been obtained through observation of Jones' activities inside his residence. *Id.* at 100.

The May Affidavit further noted that the use of pen registers and telephone toll records would not accomplish the goals of the investigation because those records could only confirm a contact between two telephones. They could not identify the participants on the call or the substance of any conversations. *Id.* at 96. Mail covers had failed to generate meaningful evidence, and that a financial investigation was unsuccessful in yielding information about the specific illegal activity in which Jones obtained his income. *Id.* at 102–03.

As to physical surveillance, the May Affidavit identified occasions on which DEA agents conducted physical surveillance but could not directly observe any illegal activity, noting that Jones took measures to frustrate surveillance efforts, like conducting drug transactions inside cars and buildings, including his apartment building. *Id.* at 97–99.

Finally, the May Affidavit addressed the tapping of Jones' cell phones. Wiretaps of Jones' cell phones achieved only limited success. Despite the wiretapping, the DEA had not identified the source of Jones' controlled substances or his customers. *Id.* at 103–06. One example of an instance in which the DEA's less intrusive investigative efforts were unsuccessful in achieving the goals of the investigation, but CCTV surveillance would have succeeded occurred on May 11, 2022. On that date, an intercepted phone conversation established that Jones agreed to supply Defendant Anthony Moore ("Moore") with a controlled substance, but the call did not establish the type or amount of the controlled substance. *Id.* at 106. Physical surveillance confirmed that the transaction occurred inside Jones' residence, but investigators were again unable to ascertain the type or amount of controlled substance Jones supplied to Moore. *Id.* CCTV surveillance would have allowed DEA agents to ascertain that information. The May Affidavit further noted that CCTV surveillance would enable the DEA to intercept FaceTime communications between Jones and his suppliers and/or customers, which the DEA would otherwise not be able to intercept. *Id.* at 104.

In sum, the May Affidavit provides a thorough explanation of the less intrusive investigative techniques that the Government used or considered using, and why those techniques were or would likely have been unsuccessful in achieving the goals of the Government's investigation. Specifically, the May Affidavit explains how each of the above investigative methods did not generate, or likely would not have generated, information about: Jones' suppliers, his customers, the location of Jones' drug proceeds, or the methods by which Jones pays his methamphetamine suppliers. *Id.* at 85.

Further, the Motion to Suppress fails to support the assertion that the Government "did not need" this information. As the Government notes, the Seventh Circuit has repeatedly held that the

8

Government's inability to obtain this type of evidence through traditional investigative methods warrants the use of electronic surveillance. *See United States v. Campos*, 541 F.3d 735, 748 (7th Cir. 2008) ("But using a wiretap to obtain additional incriminating evidence against a defendant is not problematic . . . . After all, the government's burden of proof at trial is substantially higher than its burden in obtaining an indictment. And the government was entitled to attempt to identify the full extent of this organization and its operatives."); *United States v. Ceballos*, 302 F.3d 679, 684 (7th Cir. 2002) (stating government had provided "factual bases" to show necessity, including statement by DEA agent that ordinary investigative procedures "could not 'furnish information which would fully identify all members of this ongoing criminal conspiracy or which would define the roles of these conspirators sufficiently for prosecution'"); *United States v. Dumes*, 313 F.3d 372, 379 (7th Cir. 2002) (finding government had shown adequate necessity because traditional investigative methods had not generated evidence of "drug storage locations, of quantities of drugs, and of the source of supply"); *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991) (finding that government affidavits adequately asserted necessity, in part, "because the investigation was having trouble fingering other members of the conspiracy without electronic surveillance").

The May Affidavit satisfies the necessity requirement of the federal wiretap statute, and thus adequately shows the need for CCTV surveillance under the Fourth Amendment.

2. **June Affidavit**

The June Affidavit likewise includes a detailed discussion of why less intrusive investigative methods were or would have been unsuccessful. The June Affidavit contains much of the same information as the May Affidavit with respect to the use of: informants and cooperating witnesses (*id.* at 57–58); undercover agents (*id.* at 58–60); grand jury subpoenas (*id.* at 60–61); searches (*id.* at 61–65); search warrants (*id.* at 64–65); GPS tracking devices and precision location information (*id.* at 66–68); pen registers and toll records (*id.* at 68–69); physical surveillance (*id.*

9

at 69–71); pole cameras (*id.* at 72–74); financial investigation (*id.* at 75–76); and mail covers (*id.* at 76).

The June Affidavit also identified instances in the prior thirty days, in which investigative efforts would have failed to accomplish the goals of the investigation absent the CCTV surveillance. For example, on June 10, 2022, a pole camera capture Jones receiving a parcel and carrying a laundry bad into his apartment, and later that day, surveillance officers saw a co-defendant leave Jones' apartment with a grocery bag. *Id.* at 72. Without the CCTV surveillance, "DEA would not have known that the laundry bad contained eighteen pounds of methamphetamine and that Jones distributed two pounds of methamphetamine to [that co-defendant]." *Id.* In the prior thirty days, investigators had only tentatively identified Backstrom as Jones' primary supplier and that further CCTV surveillance was needed to conclusively identify him. *Id.* at 78–79. Continued CCTV surveillance was also needed to identify Jones' additional customers and the type and quantity of controlled substances they obtained. *Id.* at 79–81.

Like with the May Affidavit, Jones does not address how the explanations regarding less intrusive investigative methods were inadequate, or why the Government "did not need" the information it sought to obtain through continued CCTV surveillance.

Jones' conclusory critique of the Government's investigation fails to show that the Government did not meet the necessity requirement supporting its request for CCTV surveillance. After careful review of the Affidavits in question, the Court finds that both Affidavits were sufficient to establish necessity for the use of CCTV surveillance and support the Government's claims that other investigative procedures were inadequate to meet the investigative objectives.

**B.      Minimization Requirement**

Jones next argues that the CCTV surveillance "far exceeded the limits of minimal intrusiveness that federal law requires" (Filing No. 749 at 6). Specifically, he argues that portions

of the CCTV Orders requiring "minimization" efforts were objectively unreasonable, overbroad, and nonspecific (Filing No. 749 at 7–8). In response, the Government persuasively argues Jones has failed to identify any specific instance in which the DEA allegedly failed to appropriately minimize its surveillance, or any viable, alternative minimization procedure (Filing No. 777 at 18).

The Government details the specific efforts taken to minimize the interception of non-pertinent communications and activities, including limiting camera interceptions to a portion of the kitchen; generally minimizing interceptions when Jones was not in his apartment; and minimizing interceptions immediately when occupants engaged in sexual activity or were naked. Additionally, when Jones was in his apartment, monitors were instructed to listen for only two minutes and, if no criminal activity took place in those two minutes, minimize surveillance for five minutes. Monitors would continue listening past the two-minute mark only if criminal activity occurred in the two-minute period, if pole camera surveillance showed a known drug trafficker entering the apartment building, or if an intercepted phone conversation or text message indicated that a FaceTime call was imminent (Filing No. 777 at 20). The investigation procedures later modified to require monitors to listen for four minute and, if no criminal activity occurred, minimize for two minutes. This change occurred only after the original five-minute "off" period resulted in DEA agents missing portions of several pertinent conversations. *Id.*

In determining whether the Government has adequately minimized its intrusion, the Seventh Circuit considers "[a] number of factors," including (1) "the nature and scope of the criminal enterprise under investigation"; (2) "the government's reasonable expectation of the contents of particular calls"; and (3) "the authorizing judge's continuing supervision." *United States v. Quintana*, 508 F.2d 867, 875 (7th Cir. 1975).

11

As to the first factor, this case involves a large, sophisticated drug trafficking enterprise operated by Jones, which "may justify considerably more interception than would a single criminal episode," especially where, as here, "the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of the far-flung conspirators and to delineate the contours of the conspiracy." *Id.*; *see United States v. Mansoori*, 304 F.3d 635, 648 (7th Cir. 2002) ("Where an investigation involves a drug ring of unknown proportions, as in this case, the need to allow latitude in eavesdroppers is close to its zenith." (quotation marks, alteration, and citations omitted)). Considering the unknown size and makeup of Jones' alleged enterprise, it was reasonable to afford the Government considerable latitude in surveilling Jones' apartment.

As to the second factor, the Government argues that it tailed its minimization procedures to fit its reasonable expectations of where and when criminal activity would take place. While the Government could not have predicted specifically where or when criminal activity might occur, the Government limited both the visual and temporal scope of its surveillance to match its reasonable expectation that criminal activity would occur in a common area of Jones' residence (the kitchen) while Jones was home. *Quintana*, 508 F.2d at 875 ("It is all well and good to say, after the fact, that certain conversations were irrelevant and [monitoring] should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take."). The Government also tailored its minimization efforts to avoid monitoring in particularly private locations (like the bathroom and bedroom) and to avoid monitoring occupants engaged in private states of dress and/or private conduct. The Government also reasonably adjusted its procedures to engage in more surveillance (four minutes "on" and two minutes "off") only after monitors noticed that the original procedures

resulted in "DEA missing several pertinent conversations." (Filing No. 777 at 20); *see Quintana*, 508 F.2d at 874 ("'[A]gents may expand or contract their interception policy as the wiretap continues . . .'" (quoting *United States v. James*, 494 F.2d a1007, 1020 (D.C. Cir. 1974))).

And as to the third factor, the Government notes that it submitted period reports to the district court. "Where the judge has required and reviewed such reports at frequent intervals, courts have been more willing to find a good-faith attempt to minimize unnecessary interceptions." *Quintana*, 508 at 875.

Based on the above, the Government has established a *prima facia* showing that its minimization efforts were reasonable. And as the Government notes, Jones has not identified any specific instance in which he believes the Government failed to adequately minimize its surveillance. "If, after a review of the intercepts, the defendants believed that the government's eavesdropping was too intrusive and that a greater degree of minimization was warranted, then it was incumbent upon them to identify at least a sample of intercepted calls that proves their point." *Mansoori*, 304 F.3d at 648. A defendant cannot meet this burden by simply complaining about the intrusions inherent in installing and using CCTV surveillance, or making conclusory assertions about a CCTV surveillance warrant or the Government's surveillance efforts, as Jones does here. *See id.* ("The adequacy of the government's minimization efforts typically cannot be determined in a generalized fashion."). Jones has likewise not suggested any alternative procedure that would have better minimized the interception of noncriminal activity while still permitting the Government to achieve its legitimate objectives. The Court therefore finds that the Government adequately and reasonably minimized CCTV interceptions and did not exceed the bounds of the Fourth Amendment.

### III. CONCLUSION

For the foregoing reasons, Jones' Motion to Suppress Video Surveillance Evidence (Filing No. 749), joined by Backstrom and Tavorn, is **DENIED**.

**SO ORDERED**.

Date:    10/4/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Ainuddin Ahmed
DOJ-USAO
aineahmed@aineahmedlaw.com

Bradley A. Blackington
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
bradley.blackington@usdoj.gov

Kelsey Massa
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kelsey.massa@usdoj.gov

Ross G. Thomas
The Law Office of Ross G. Thomas
rossthomas@defenselawyerindiana.com

Stacy R. Uliana
ULIANA LAW
stacy@ulianalaw.com

Maxwell Bryant Wiley
BALDWIN PERRY & KAMISH, P.C.
max@criminaldefenseteam.com