UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cr-00082-TWP-MJD |
| | ) | |
| KEITH JONES, | ) | -01 |
| KEVIN BACKSTROM, | ) | -02 |
| ANTHONY MOORE, | ) | -13 |
| | ) | |
| Defendants. | ) | |

## ENTRY DENYING DEFENDANTS' RULE 29(C) MOTION

This matter is before the Court on a Rule 29(c) Motion filed collectively by Defendants Keith Jones ("Jones"), Kevin Backstrom ("Backstrom"), and Anthony Moore ("Moore") (collectively, "Defendants") (Filing No. 962). In the Superseding Indictment, all Defendants were charged with Count 1: conspiracy to distribute controlled substances (Filing No. 503). Jones was additionally charged with Count 2: engaging in a continuing criminal enterprise; Count 3: conspiracy to launder monetary instruments; Counts 4 and 19: distribution of methamphetamine; Counts 9, 10, 14, and 15: possession of methamphetamine with intent to distribute; Counts 12 and 16: distribution of fentanyl; Count 21: possession of fentanyl with intent to distribute; and Counts 22 and 23: possession of a firearm by a convicted felon. *Id.* at 12, 16, 18, 20–23, 25, 26–27. Backstrom was additionally charged with Count 3: conspiracy to launder monetary instruments. *Id.* at 16. Moore was additionally charged with Count 7: possession of methamphetamine with intent to distribute; Count 25: possession of cocaine hydrochloride with intent to distribute; and Count 26: possession of fentanyl with intent to distribute. *Id.* at 19, 29. Following a four-week jury trial that began on October 23, 2023, the jury returned a verdict finding Jones guilty of all counts

charged against him; finding Backstrom guilty of all counts charged against him; and finding Moore guilty of Counts 25 and 26 and not guilty of Count 7. The Defendants timely filed their motion for judgment of acquittal, within fourteen days after the guilty verdicts. For the following reasons, the Defendants' Rule 29(c) Motion is **denied**.

### I. LEGAL STANDARD

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction.

Federal Rule of Criminal Procedure 29(a). Rule 29(c) states,

> [a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later. . . . If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal.

When considering a motion for judgment of acquittal,

> we ask whether at the time of the motion there was relevant evidence from which the jury could reasonably find the defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government. We must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences.

*United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) (internal citations and punctuation omitted). "[T]he reviewing court must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference." *Id.* The court "must not rend the fabric of evidence and examine each shred in isolation." *Id.* (internal citation and quotation marks omitted); *see also United States v. Wojtas*, No. 15 CR 399, 2018 U.S. Dist. LEXIS 242961, at *14 (N.D. Ill. June 25, 2018) ("In a circumstantial case like this one, each piece of evidence is not viewed in isolation, and drawing inferences from the collective weight of the evidence is not improper.").

The standard is "demanding for criminal defendants . . . and [the court] will reverse only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Maez*, 960 F.3d 949, 966 (7th Cir. 2020) (internal citations and quotation marks omitted). "Appellants raising insufficiency challenges face a nearly insurmountable hurdle." *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017) (internal citation and quotation marks omitted). "Reversal under this standard is rare because we defer heavily to the jury's findings and review evidence in the light most favorable to the government." *Id.*

## II. DISCUSSION

The Government rested its case-in-chief on November 15, 2023. Thereafter, each of the Defendants made a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). After hearing the parties' separate arguments, the Court denied each Defendant's motion, and the case was submitted to the jury for deliberation. On November 17, 2023, after approximately ten hours of deliberation, the jury returned guilty verdicts against Jones, Backstrom, and Moore. In their Motion, "[f]or the reasons stated on the record and in closing arguments, Defendants, by counsel, respectfully renew their motions for judgment of acquittal pursuant to Rule 29(c) and request the Court enter judgments of acquittal on all Counts mentioned herein." (Filing No. 962). The Court will address each Defendant's motion in turn.

### A. Keith Jones' Rule 29 Motion

At the conclusion of the Government's case-in-chief, Jones moved for a judgment of acquittal challenging the sufficiency of evidence only as to Count 2: engaging in a continuing criminal enterprise ("CCE"). (Filing No. 1101 at 21–29). To sustain a CCE conviction, the Government must prove:

3

> (1) a violation of the federal narcotics laws; (2) which crime is a part of a series of violations of the federal narcotics laws; (3) undertaken by the defendant and at least five other individuals; (4) with respect to whom the defendant holds a supervisory, managerial, or organizational role; and (5) from which the defendant receives substantial income or resources.

*United States v. Gibbs*, 61 F.3d 536, 537 (7th Cir. 1995).

At trial, Jones argued the Government failed to prove all the elements of a CCE offense. Specifically, Jones' counsel argued that Jones was not an organizer or manager of five or more people; that simply purchasing cocaine from the organizer, standing alone, is not enough to satisfy the relationship requirement; and merely fronting, without additional elements of control, is nothing more than a variation of the traditional buyer-seller relationship. (Filing No. 1101 at 21–28). Counsel conceded there was evidence of managerial authority over Jamie Rayner ("Rayner") Imani Jones, and Tameka Washington ("Washington"); but asserted beyond those three, there is insufficient evidence to establish that Jones managed five or more persons. *Id*. The Government responded in opposition, and after hearing and considering the parties' arguments, the Court denied Jones' oral motion for judgment of acquittal for the reasons stated on the record. *Id*. at 28–29.

Jones formally renews his Rule 29 motion in the Motion before the Court. (Filing No. 962). The Government responds to the renewed Motion by reciting the significant evidence that was presented to support each of the elements of the CCE offense. With respect to the first two elements—that Jones violated the federal narcotics laws as part of a continuing series of at least three or more of the narcotics offenses alleged in Count 2—the evidence included extensive testimony given by Drug Enforcement Agency ("DEA") officers, local law enforcement officers, expert witnesses, co-conspirators, and other witnesses. Some of the many exhibits that were admitted during trial included wiretap recordings and closed-caption television video ("CCTV")

recordings of Jones engaging in trafficking of an enormous quantity of drugs with numerous individuals.

With respect to Jones' challenges on the third and fourth elements—that Jones held a supervisory, managerial, or organizational role with respect to at least five individuals—the Government points to the considerable evidence showing instances in which Jones' exercised control over several individuals. The Court agrees with the Government that there was sufficient evidence to support the management element of the CCE offense. The Seventh Circuit addressed the management element of the CCE statute in *United States v. Moya-Gomez*, stating it has "liberally construed" this element and noting that the CCE statute was written in the disjunctive; the Government only needs to prove that a defendant served as either a supervisor, manager, or organizer, and not all three. 860 F.2d 706, 746 (7th Cir. 1988). The Seventh Circuit has also explained that the terms organizer, supervisor, and manager should receive their "ordinary meaning." *Id*. (citing *United States v. Wilkinson*, 754 F.2d 1427, 1431 (2d Cir. 1985)).

The evidence at trial established that Jones organized or supervised up to ten individuals—Rayner, Imani Jones, Washington, Anthony Jones, Kevin Jones, his minor daughter ("B.J."), Marcus Miles, Katrina Green, Herman Tavorn, and Michael Hill. As noted earlier, Jones concedes there is evidence of managerial authority over his purported girlfriend Rayner, his daughter Imani Jones, and Washington. The Government addressed the relationship between Jones and the other purported individuals as follows:

> Keith Jones also exercised managerial control over Anthony Jones (Keith's cousin) and Kevin Jones (Keith's brother). Jerry Bibbs testified that Keith Jones sent both Anthony Jones and Kevin Jones to Bibbs' residence in Fort Wayne to collect drug proceeds and transport the money to Keith Jones in Indianapolis. (Tr. 1657–59.) Bibbs testified that law enforcement officers stopped Anthony Jones after he had collected between $9,000 and $10,000 from Bibbs earlier in the day. (Tr. 1659–60.) In fact, a deputy in the Grant County Sheriff's Office stopped Anthony Jones and seized over $14,000 from him on September 28, 2021. (Tr.

5

1737–1745.) The evidence supports the conclusion that both Kevin Jones and Anthony Jones transported drug proceeds from Fort Wayne to Indianapolis at Keith Jones' direction.

. . .

Keith Jones also exercised managerial control over B.J. During the afternoon of June 16, 2022, Keith Jones told Sean Devonish that he had to leave his apartment and would direct his twelve-year old daughter, B.J., to admit Devonish into the apartment, so that Devonish could obtain 250 grams of fentanyl. (Tr. 2352–55; Ex. 763, lines 5–21.) During his telephone conversation with Devonish, Keith Jones told B.J., who was with him in the apartment, to admit "my buddy" into the residence and to make sure that she answers her telephone. (Tr. 2355–56; Ex. 763, lines 21–25.) Shortly thereafter, Devonish came to Keith Jones' apartment and B.J. admitted Devonish into the apartment. (Tr. 2357.) Devonish entered the apartment and began searching for the fentanyl. (*Id.* at 2357–60.) B.J. provided her cellular telephone to Devonish and Devonish placed a FaceTime call to Keith Jones. (*Id.*) During the FaceTime call, Devonish showed a package of fentanyl to Keith Jones and confirmed that the fentanyl was the fentanyl that Jones intended to deliver to him. (*Id.* at 2361.) Devonish left the apartment with the fentanyl. (*Id.* at 2362. Keith Jones thus directed B.J. both to admit Devonish into the residence to obtain a large amount of fentanyl and to serve as a conduit to carry information from himself to Devonish relative to the drug transaction.

. . .

Keith Jones also exercised managerial control over Marcus Miles. On June 25, 2022, Miles received a parcel containing cocaine for Jones at a residence located at 7560 Camberwood Drive in Indianapolis. (Tr. at 3008–09.) Before the parcel arrived at the Camberwood residence, Jones confirmed with Miles that Miles had tracked the parcel for delivery. (Tr. 3008; Ex. 884.) When the FedEx driver brought the parcel to the Camberwood Drive residence, Miles met the driver and told him to take the parcel to the residence. (Ex. 886, lines 7–8.) Jones chastised Miles and told him that he should not have been in the vicinity of the residence when the driver delivered the parcel and should not have let the driver see him. (Tr. 3013–14; Ex. 886, lines 15–26.) Jones told Miles not to let the driver see him the next time they sent a parcel to that residence. (Ex. 886, lines 42, 50–52.) During another intercepted telephone conversation during which they discussed the same subject, Miles directly acknowledged the fact that Jones managed and supervised his activities, stating "I listen very well. You tell me to do something, I do it." (Ex. 887, lines 6–7.) This evidence supports the conclusion that Jones organized and managed the efforts of Miles to collect the parcel. Moreover, during the telephone conversations, Jones instructed Miles on the proper method to receive parcels in the mail.

. . .

>Keith Jones also exercised managerial control over Katrina Green, who permitted Jones to use the detached garage located at 2877 North Centennial Street as a stash location for controlled substances. Trial testimony established that Jones paid Green for the use of the stash location. (See Tr. 3023–24; Ex. 1194.) The use of another person's home to conceal or process drugs demonstrates a defendant's managerial position.
>
>. . .
>
>Keith Jones also exercised managerial control over Herman Tavorn. On June 14, 2022, Keith Jones delivered one kilogram of fentanyl to Ladonna Jones. (Tr. 1357–66.) Ladonna delivered the cocaine to Tavorn and Tavorn proceeded to deliver it to Tony Walker inside of Tavorn's residence. (*Id.* at 1366–70.) Walker gave a stack of money to Tavorn and left the residence with the fentanyl. (*Id.*) Ladonna and Tavorn later noticed that Walker had given them much less than the $50,000 that they were supposed to collect for the fentanyl. (*Id.* at 1370–71.) Keith Jones spoke with Ladonna Jones and Tavorn about their efforts to collect the balance of the money owed. (*Id.* at 1373–82.) During his conversation with Tavorn, Keith Jones directed Tavorn to contact Walker to come up with the money. (Ex. 722.) Jones told Tavorn that he needed to receive either the money for the fentanyl or the fentanyl returned by the following day. (*Id.*, lines 74–76.) Jones' statement constituted an implicit threat to Tavorn. Tavorn acknowledged Jones' statement and told Jones that he was working to satisfy his obligation to Jones. (*Id.*, lines 69, 73, 77.) Keith Jones, therefore, directed Tavorn to contact Walker to obtain the money and implicitly threatened Walker with consequences if he failed to collect the money. Jones' directions to Tavorn, coupled with his threats, demonstrated his supervisory role over Tavorn.
>
>. . .
>
>Finally, Keith Jones exercised managerial control over Michael Hill. Jones delivered fentanyl and methamphetamine to Hill from the spring of 2021 through July 21, 2022. (Tr. 2207–11.) During these transactions, Jones fronted the controlled substances to Hill, established the price at which Hill could sell the controlled substances, and paid Hill a commission after he sold the controlled substances. (Tr. 2208–11.)

(Filing No. 1115 at 7–11).

The Government argues, and the Court agrees, that the evidence presented at trial established that Jones served as the kingpin in charge of a drug trafficking organization that distributed enormous amounts of methamphetamine, as well as large quantities of fentanyl and

7

cocaine, in the Southern District of Indiana, and that he exercised managerial control over at least five persons.

With respect to the fifth element—that Jones obtained substantial income or resources from the offenses—the evidence is overwhelming. The evidence established that Jones had no legitimate source of employment or income during the relevant time period. Receipts for the purchases of expensive jewelry and other items were admitted into evidence. The CCTV videos depicted Jones counting large sums of money, and the Government presented evidence of property seized from Jones residence at 6160 North Rural Street, which included $265,095.00 in U.S. currency, jewelry, and purses.[1]

The Government's position is well-taken, and Jones has failed to satisfy his Rule 29(c) burden. There has been no showing that the record contains no evidence from which the jury could find Jones' guilt beyond a reasonable doubt as to Count 2. The lengthy trial testimony and the numerous exhibits provided relevant evidence from which the jury could reasonably find Jones guilty beyond a reasonable doubt on the CCE offense. Setting aside the jury's verdict and entering an acquittal for Jones is not warranted.

**B.      Anthony Moore's Rule 29 Motion**

At the close of the Government's case-in-chief, Moore moved for judgment of acquittal on Count 1: conspiracy to distribute controlled substances; Count 7 possession of methamphetamine

---

[1] The jewelry seized includes, but is not limited to, the following items: (1) Man's Diamond Stamped 18K Gold Rolex Oyster Watch; (2) Man's Diamond Stamped Stainless Steel Rolex Oyster Watch; (3) Man's Stamped 18KT Gold Cartier Santos 100 Wristwatch; (4) 14KT White Gold Diamond Stud Earrings (Pair); (5) ICEBOX Stamped 14KT Rose Gold Diamond Cross Pendant; (6) ICEBOX Stamped 14KT Diamond Slide Pendant; (7) Stamped 14KT Rose Gold Diamond Slide Pendant; (8) Stamped 10KT Yellow Gold Diamond Key Slide Pendant; (9) ICEBOX Stamped 14KT Gold Diamond Byzantine Link Bracelet; (10) ICEBOX Stamped 14KT White Gold 20" Diamond Link Chain; (11) ICEBOX Stamped 14KT Rose Gold 18" Diamond Chain; (12) Stamped 14KT Rose Gold 22.5" Diamond Neck Chain; and (13) Stamped 18KT Yellow Gold Diamond 18" Chalelaine Slide Pendant & Chain (collectively Asset Identification Number 22-DEA-694025). The Government also seized a Chanel purse and a Louis Vuitton purse (collectively Asset Identification Number 22-DEA694028). (Filing No. 1129).

with intent to distribute; Count 25: possession of cocaine hydrochloride with intent to distribute; and Count 26: possession of fentanyl with intent to distribute. (Filing No. 1101 at 11–12). Moore's motion was denied by the Court on the record before the jury returned a verdict of guilty on Counts 1, 25, and 26. *Id*. at 11–15. The jury acquitted Moore on Count 7. In his current Motion, Moore asks the Court to set aside the jury's verdict as to Counts 1, 25, and 26 and enter an acquittal because the evidence was insufficient to support his conviction on those three counts. With respect to Count 1, Moore argued that the evidence was insufficient to support a verdict of guilty because he only purchased small quantities of drugs from Jones, he was not involved in the larger conspiracy, and he did not intend to distribute the drugs.

The Court is not persuaded by Moore's arguments. As noted by the Government in their response:

> The evidence presented against Moore centered around the testimony of co-defendant Ladonna Jones, intercepted telephone conversations and surveillance pertaining to three drug transactions between Keith Jones and Moore, and the results of a search warrant executed at Moore's residence.
>
> Ladonna Jones testified that she dated Moore during the summer of 2019. (Tr. 1327.) Ladonna and Moore encountered Keith Jones at a bar in Indianapolis during the summer of 2019. (Tr. 1328.) During the meeting, Keith asked Ladonna if Moore sold drugs. (*Id.* at 1329.) Ladonna responded affirmatively. (*Id.*) Keith then pulled Moore aside and discussed prices for cocaine. (*Id.* at 1330.) After the encounter at the bar, Keith began supplying Moore with cocaine. (*Id.*) From the summer of 2019 through early 2020, Ladonna served as the middleperson in the drug deals between Keith and Moore. (*Id.* at 1331.) Over this six to eight-month period, Keith and Ladonna supplied Moore with cocaine once or twice per month, in quantities ranging from nine to eighteen ounces. (*Id.* at 1331–32.) Moore initially paid Jones cash at the time of the transaction, but Jones began fronting the cocaine to Moore as their relationship developed. (*Id.* at 1332.) Ladonna and Moore stopped dating in early 2020. (*Id.* at 1333.) Ladonna, however, still interacted with Moore until their arrest in July 2022. (*Id.* at 1333–34.) From these conversations, Ladonna learned that Moore received cocaine, methamphetamine, and fentanyl from Keith up until their arrests. (*Id.*)
>
> Intercepted telephone conversations and surveillance established that Moore obtained approximately one-half kilogram of cocaine from Jones at Jones'

9

apartment on May 11, 2022. (Tr. 1195–99.) Moore placed a telephone call to Jones and ordered one-half kilogram of cocaine. (*Id.* at 1195–99.) Jones agreed to deliver the cocaine to Moore at Jones' apartment. (*Id.* at 1199.) A security camera captured Moore entering Jones' apartment building. (*Id.*) ATF Task Force Officer Jason Hart, posted outside of the apartment building, saw through the windows of Jones' apartment and observed Moore remain inside of Jones' apartment for five to seven minutes. (*Id.* at 1147.) TFO Hart saw Jones and Moore exchanging something while inside of the apartment. (*Id.*) The security camera captured Moore leaving Jones' apartment shortly afterward, carrying a black bag that he did not possess when he came into the apartment. Based upon this evidence, a jury could make the reasonable inferences that Jones delivered the cocaine to Moore inside of the apartment and that Moore left the apartment building with the cocaine.

Trial testimony also established that Moore obtained two pounds of methamphetamine from Jones on June 1, 2022. A CCTV camera inside of Jones' apartment, which DEA installed between the May 11 transaction and June 1, captured Jones packaging two pounds of methamphetamine into a Target bag, placing the Target bag into a black satchel, and leaving the apartment. (Tr. 1208–11.) Surveillance officers followed Jones as he traveled to various locations in Indianapolis and ultimately took the Target bag containing the methamphetamine into Moore's residence. (*Id.* at 1211–19.) Jones left Moore's residence without the Target bag. (*Id.* at 1219.) Law enforcement officers continued to surveil Moore's residence and later observed Moore leave the residence with a firearm. (*Id.* at 1220.) Based upon this evidence, a reasonable jury could have inferred that Jones delivered the methamphetamine to Moore inside of the residence.

Finally, trial testimony established that Moore received 50 grams of fentanyl from Jones on June 28, 2022 and that Moore delivered one-half kilogram of cocaine to Jones during the same transaction. On June 27, 2022, Danyale Buchanan called Jones on the telephone and ordered one kilogram of cocaine. (Tr. 960–61; Ex. 921, lines 4–7.) Buchanan called Jones the following morning and told Jones that he was ready to acquire the kilogram of cocaine. (Tr. 961–62; Ex. 922, p. 1.) Jones replied that he no longer possessed the whole kilogram of cocaine, but that he could sell Buchanan one-half of a kilogram. (Tr. 962; Ex. 922, p. 1.) Jones then told Buchanan that he had delivered one kilogram of cocaine to one of his other customers earlier and that his customer might not have sold it yet. (Tr. 963; Ex. 922, p.1.) Jones told Buchanan that he would need to pay $28,000 for the kilogram if he obtained it through Jones' customer, instead of the lower price that Jones typically charged Buchanan. (Tr. 963; Ex. 922, p. 1.) Buchanan agreed to conduct the transaction. (Tr. 963; Ex. 922, p. 2.) Shortly thereafter, Jones talked to Moore on the telephone. During the conversation, Jones agreed to bring 50 grams of fentanyl to Moore. (Tr. 1022–23; Ex. 923, lines 29–30.) Moore agreed to deliver one-half kilogram of cocaine to Jones at the same time. (Ex. 923, line 24.) A jury could reasonably infer from the evidence that Jones contacted Moore to provide the additional half-kilogram of cocaine that Buchanan requested. After the telephone conversation, the CCTV camera installed in Jones' apartment captured Jones

10

> obtaining approximately 50 grams of fentanyl, placing it into his pocket, and leaving the apartment. (Tr. 1026–31.) Jones traveled to Moore's residence, located at 10301 Starhaven Court in Indianapolis, and returned to his apartment with a silver gift bag. (*Id.* at 1031–33.) The CCTV camera captured Jones removing one-half kilogram of cocaine from the silver gift bag, combining it with another one-half kilogram of cocaine that Jones had in his apartment, weighing the cocaine, and placing the entire kilogram of cocaine into a Ziploc bag. (*Id.* at 1033–38.) Jones wrapped the Ziploc bag containing the cocaine in shrink wrap, placed the package into the silver gift bag, and left the apartment with the gift bag containing the cocaine. (*Id.* at 1038–40.) Jones took the gift bag containing cocaine to an apartment building and delivered it to Buchanan. (*Id.* at 966–67.) A reasonable jury could infer that Jones originally delivered one kilogram of cocaine to Moore. . . .

([Filing No. 1119 at 3](Filing No. 1119 at 3)–7). Considering this evidence in the light most favorable to the Government, the record is not devoid of any evidence from which the jury could find that Moore is guilty beyond a reasonable doubt of joining in Jones' conspiracy to distribute controlled substances.

With respect to Count 25: possession of cocaine with intent to distribute, the Government presented evidence of three samples of cocaine weighing 102.9 grams, scales, and other paraphernalia used in conjunctions with drug distribution. These items were recovered at Moore's residence during execution of a federal search warrant on July 21, 2022. DEA Special Agent Matthew Holbrook ("Special Agent Holbrook") provided expert testimony that this amount of cocaine, coupled with the presence of drug paraphernalia used in conjunction with the distribution of drugs, supports an inference that Moore intended to distribute the cocaine, and did not possess it merely for personal use.

With respect to Count 26: possession of fentanyl with intent to distribute, the Government presented evidence of 32.3 grams of fentanyl found at Moore's residence during the execution of the federal search warrant on July 21, 2022. Special Agent Holbrook again provided expert testimony that this amount of fentanyl, coupled with the presence of drug paraphernalia used in conjunction with the distribution of fentanyl, supports an inference that Moore intended to distribute the fentanyl, and did not possess it merely for personal use. Special Agent Holbrook's

expert testimony presented sufficient evidence to sustain Moore's convictions for Counts 25 and 26.

The record is not devoid of any evidence from which the jury could find guilt beyond a reasonable doubt as to Moore's three counts of conviction. The trial testimony and the exhibits identified by the Government provided sufficient evidence from which the jury could reasonably find Moore guilty beyond a reasonable doubt of Count 1: conspiracy to distribute controlled substances; Count 25: possession of cocaine hydrochloride with intent to distribute; and Count 26: possession of fentanyl with intent to distribute. Setting aside the jury's verdict and entering an acquittal for Moore is not warranted.

**C.    Kevin Backstrom's Rule 29 Motion**

At the close of the Government's case-in-chief, Defendant Backstrom moved for judgment of acquittal on Count 1: conspiracy to distribute controlled substances. (Filing No. 1101 at 29–34). Backstrom's motion was denied by the Court on the record before the jury returned a verdict of guilty on both counts charged against him: Count 1: conspiracy to distribute controlled substances; and Count 3: conspiracy to launder monetary instruments. In his oral motion, Backstrom only challenged the sufficiency of the evidence for Count 1, specifically arguing that his relationship with Jones only amounted to a buyer-seller relationship, and not a conspiracy. (*Id.*) In his current Motion, Backstrom asks the Court to set aside the jury's verdict and enter an acquittal on Count 3. However, because he challenged only Count 1 in his oral motion, and the instant Motion is a renewed motion, the Court will address only the challenge to Count 1.

The Seventh Circuit has distinguished between a defendant's participation in a conspiracy and a defendant's participation in a mere buyer-seller relationship. This distinction lies in the nature of the agreement that is required to establish a conspiracy. A mere buyer-seller agreement simply

12

involves a buyer and a seller agreeing to exchange money for drugs. *See United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993). That type of agreement cannot sustain a conspiracy conviction because the mere buyer-seller agreement constitutes the substantive crime of distribution and involves no separate criminal object. *Id*. A conspiracy, on the other hand, requires an agreement between the buyer and the seller to distribute the drugs. *United States v. Avila*, 557 F.3d 809, 816 (7th Cir. 2009). Furthermore, the Government does not need to prove that Backstrom conspired with all of the Defendants named in the Superseding Indictment. *Id*. at 816. Instead, the Government "need only prove that the defendant conspired with *anyone* to commit the crime charged in the indictment." *Id*. (emphasis in original). In this case, the Government proved the existence of a conspiratorial agreement between Backstrom and Jones and established the existence of this conspiratorial agreement with both direct and circumstantial evidence.

As noted by the Government in its response:

> Backstrom and Jones appeared on the same side of the sale of drugs to a third party on several occasions. For instance, on June 16, 2022, Backstrom, Jones, and Sean Devonish engaged in a telephone conversation that DEA intercepted through the covert monitoring device installed within Jones' apartment. (Tr. 2306–07.) During the telephone conversation, Jones and Backstrom discussed obtaining 200 pounds of methamphetamine from Backstrom's source. (Tr. 2312–13; Ex. 733, lines 158–65.) Jones turned to Devonish and asked if Devonish wanted to split 100 pounds of methamphetamine with him. (Tr. 2313, Ex. 733, line 166.) Devonish agreed. (Ex. 733, line 167.) As the conversation progressed, Jones, Backstrom, and Devonish agreed to split 200 pounds of methamphetamine among each other. (Tr. 2313; Ex. 733, lines 197–211.) Backstrom, therefore, agreed to obtain 200 pounds of methamphetamine from his source and ship it to Jones, who would then deliver some of the methamphetamine to Devonish. Backstrom and Jones thus became on the "same side" of a methamphetamine transaction with Devonish. As a result, a conspiracy exists. *See Rock*, 370 F.3d at 715 (conspiracy existed, as opposed to mere buyer-seller agreement, when defendant and co-conspirator remain "on the same side of a sale of drugs to a third party."); Payton, 328 F.3d at 912 ("[W]hen a buyer or seller is assisted by a third person, that collaboration is punishable as a conspiracy. The 'buyer-seller' argument is irrelevant in such cases because the conspirators are on the same side of the sale.").

Similarly, Backstrom and Jones were on the same side of the sale of one kilogram of fentanyl to Marcus Miles on July 14, 2022. On July 12, 2022, Backstrom, Jones, and Miles had an extended series of telephone conversations during which Backstrom agreed to provide one kilogram of extremely potent fentanyl to Jones, which Jones would then deliver to Miles. (Tr. 1949–86; Ex. 1001–03.) During these telephone conversations, Jones specifically told Backstrom that his customer (Miles) had told Jones that he wanted to proceed with the transaction. (Tr. 1981; Ex. 1003, lines 141–42.) Later in the same call, Jones reiterated that Miles wanted the kilogram of fentanyl and even made the snide comment to Backstrom that he wanted to place insurance on Miles' life due to the dangerousness of the fentanyl that Backstrom and Jones would deliver to him. (Tr. 1983; Ex. 1003, lines 255, 257.) Backstrom shipped the fentanyl to Jones and Miles came to Jones' apartment on July 14 to pick it up. (Tr. 1986–88.) After Miles entered Jones' apartment, Jones and Miles placed a telephone call to Backstrom. (Tr. 1988; Ex. 1007.) At the beginning of the conversation, Jones advised Backstrom that Miles had arrived at his apartment to obtain the fentanyl. (Tr. 1989–90; Ex. 1007, line 30.) Backstrom proceeded to provide Miles with extensive information about the fentanyl – that the fentanyl was exceptionally pure, that Miles would need to wear a mask, gloves, and goggles to handle the fentanyl, and that Miles could cut the kilogram of fentanyl with three to four kilograms of a cutting agent and still have a quality product. (Tr., 1989–91; Ex. 1007, lines 30–132.) Miles paid Jones for the fentanyl and left the apartment. (Tr. 1989, 2003.) Based upon this evidence, Backstrom and Jones placed themselves on the same side of a fentanyl transaction with Miles. As a result, a conspiracy existed as opposed to a buyer-seller agreement. See Rock, 370 F.3d at 715.

([Filing No. 1118 at 4](#)–6).

The Government also presented circumstantial evidence of a conspiracy. The Seventh Circuit has held that the following factors support examples of circumstantial evidence to distinguish a conspiracy from a buyer-seller relationship: (1) sales on credit or consignment; (2) an agreement to look for other customers; (3) a payment of commission on sales; (4) an indication that one party advised the other on the conduct of the other's business; and (5) an agreement to warn of future threats to each other's business stemming from competitors or law enforcement authorities. *Johnson,* 592 F.3d at 755–56. Here, on several occasions, Backstrom fronted controlled substances to Jones on credit; Jones' notebook recorded debts that he owed to Backstrom; the two shared advice about how to conduct their joint drug trafficking business; they

14

advised one another on best practices of their drug trafficking activities; and they warned one another about the signs of police activity and how to evade law enforcement.

The record is not devoid of any evidence from which the jury could find guilt beyond a reasonable doubt as to Backstrom's conviction on Count 1. The trial testimony and the exhibits identified by the Government provided both direct and circumstantial evidence from which the jury could reasonably find Backstrom guilty beyond a reasonable doubt of Count 1: conspiracy to distribute controlled substances.

### III.   CONCLUSION

This Court may reverse a jury verdict only if "viewing the evidence in the light most favorable to the prosecution, the record contains no evidence on which a rational jury could have returned a guilty verdict." *United States v. Murphy,* 406 F.3d 857, 861 (7th Cir. 2005). For the reasons previously stated on the record, and in this Order, the Court concludes that sufficient direct and circumstantial evidence was presented at trial for a rational jury to have returned verdicts of guilty. For the foregoing reasons, the Court **DENIES** the Rule 29(c) Motion filed by Defendants Keith Jones, Kevin Backstrom, and Anthony Moore seeking judgment of acquittal (Filing No. 962).

**SO ORDERED.**

Date: 2/23/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Bradley A. Blackington
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
bradley.blackington@usdoj.gov

Jonathan A. Bont
Frost Brown Todd LLP
jbont@fbtlaw.com

Kelsey Massa
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kelsey.massa@usdoj.gov

Ross G. Thomas
The Law Office of Ross G. Thomas
rossthomas@defenselawyerindiana.com

Maxwell Bryant Wiley
BALDWIN PERRY & KAMISH, P.C.
max@criminaldefenseteam.com